# EXHIBIT A

po

## COMMONWEALTH OF MASSACHUSETTS

**Suffolk, ss.**

| | |
|---|---|
| JANICE PROGIN, | **SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT BUSINESS LITIGATION SESSION** |
|     Plaintiff, on behalf of herself and others similarly situated, | |
|         v. | CIVIL ACTION NO. _____ |
| UMASS MEMORIAL HEALTH CARE, INC., UMASS MEMORIAL HOSPITALS, INC., UMASS MEMORIAL MEDICAL CENTER, INC., UMASS MEMORIAL HEALTHALLIANCE-CLINTON HOSPITAL, INC., MARLBOROUGH HOSPITAL, and HARRINGTON MEMORIAL HOSPITAL, INC., | **JURY TRIAL DEMANDED** |
|     Defendants. | |

## <u>COMPLAINT</u>

Plaintiff Janice Progin, on behalf of herself and the proposed Class (defined below), alleges as follows:

### <u>Preliminary Statement</u>

1.      Plaintiff brings this action to remedy the secret interception of the contents of internet communications between healthcare consumers and certain healthcare providers. Specifically, the Defendants (defined below) aided in the interception of communications between Plaintiff and other Class Members (defined below) and a website maintained by UMass Memorial Medical Center and other medical facilities in central Massachusetts (the "UMass Memorial Website"). These communications were intercepted by Google, Facebook (now known as "Meta," but referred to in this complaint as "Facebook"), and other companies that provide so-called

"tracking software." Class Members' communications with the UMass Memorial Website were secretly and contemporaneously monitored, recorded, and retransmitted to these third parties without their knowledge or consent whenever Plaintiff or other Class Members visited the UMass Memorial Website or any page within that website.

2.  Defendants actively aided this secret interception of healthcare consumers' communications with their website. Defendants aided the interceptions by injecting hidden code into their websites to permit Google, Facebook, and others to intercept the communications.

3.  Defendants do not disclose to healthcare consumers that it helps third parties such as Google and Facebook to intercept the contents of their communications with the UMass Memorial Website, nor do they seek their content for such disclosure. On the contrary, Defendants **falsely** tell healthcare consumers, through their published online policies and terms of service, that they do **not** share such information.

4.  The Massachusetts Wiretap Act (M.G.L. c. 272 § 99) makes it unlawful to "secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire or oral communication." "Wire" communications include communications between websites and website users. The Massachusetts Wiretap Act's prohibitions apply even when one of the parties to the communications knows about the interception if that party to the communication secretly records the communication or aids another in recording the communication. It is not necessary for a violation of the Massachusetts Wiretap Act that the entirety of the contents of any communication be intercepted; instead, an unlawful interception occurs when (i) the identity of the parties to the communication; (ii) the existence of the communication; **or** (iii) any part of the contents, substance, purport, or meaning of the communication is intercepted or recorded.

5.     The Massachusetts Legislature enacted the Massachusetts Wiretap Act to counter "the uncontrolled development and unrestricted use of modern electronic surveillance devices," which it found "pose grave dangers to the privacy of all citizens of the commonwealth." M.G.L. c. 272 § 99(A) (preamble). Although the internet did not exist at the time of the Act's passage, internet communications fall comfortably within the Act's express terms, and, if anything, the purposes of which the Massachusetts Wiretap Act were enacted are only more significant today, as technology companies have continually chipped away at the privacy of individuals, contrary to the public policies that animate the Massachusetts Wiretap Act.

6.     Although this case concerns the interception of communications that disclose healthcare consumers' private health information, Plaintiff's claim under the Massachusetts Wiretap Act does not depend on whether the intercepted communications reveal an individual's private health information or any other sensitive information. The Act applies to all interceptions, regardless of the nature or substance of the communications intercepted.

7.     The Massachusetts Wiretap Act provides a private remedy for the secret interception of wire communications, enforceable against both the intercepting party **and** any party that aids such an interception.

8.     Defendants aided interceptions completed by Google, Facebook, and other third parties of healthcare consumers' communications with the UMass Memorial Website. Plaintiff seeks statutory remedies under the Massachusetts Wiretap Act both on her own behalf and on behalf of all other Massachusetts residents who accessed the UMass Memorial Website.

## **PARTIES**

9.     Plaintiff Janice Progin is a resident of Gardner, Massachusetts. Plaintiff is a patient at the UMass Memorial Medical Center and regularly uses the UMass Memorial Website to (i) obtain information about UMass Memorial Medical Center doctors (including their credentials and

3

backgrounds); (ii) search for information on particular symptoms, conditions, and medical procedures; and (iii) obtain and review her personal medical records through the website's patient portal.

10.     Defendant UMass Memorial Health Care, Inc. is a corporation that operates in Worcester, MA. It is the parent company for defendants UMass Memorial Hospitals, Inc. and UMass Memorial Medical Center, Inc. Together with and through its subsidiaries, UMass Memorial Health Care, Inc. operates hospitals and other healthcare facilities in central Massachusetts that use the UMass Memorial Website.

11.     Defendant UMass Memorail Hospitals, Inc., is a corporation that operates in Worcester, MA. It is a subsidiary of Umass Memorial Health Care, Inc. According to filings with the Secretary of the Commonwealth of Massachusetts, its function is to coordinate the provision of healthcare services among healthcare facilities affiliated with UMass Memorial Health Care, Inc., including the healthcare facilities that share the UMass Memorial Website. It also "provide[s]…information systems" to those healthcare facilities. Based on this filing and upon information and belief, Umass Memorial Hospitals, Inc. is responsible for maintaining the UMass Memorial Website.

12.     Defendant UMass Memorial Medical Center, Inc. is a corporation located in Worcester, MA. It operates and maintains UMass Memorial Medical Center, a hospital with multiple campuses in Worcester, MA. It uses the UMass Memorial Website to communicate with healthcare consumers.

13.     Defendant UMass Memorial Healthalliance-Clinton Hospital, Inc. is a corporation located in Clinton, MA. It operates and maintains UMass Memorial Health – HealthAllicance-Clinton Hospital, a group of hospitals with campuses in Clinton, MA; Fitchburg, MA; and

Leominster, MA. It uses the UMass Memorial Website to communicate with healthcare consumers.

14.     Defendant Marlborough Hospital is a corporation located in Marlborough, MA. It operates and maintains Marlborough Hospital, a hospital in Marlborough, MA. It uses the UMass Memorial Website to communicate with healthcare consumers.

15.     Defendant Harrington Memorial Hospital, Inc. is a corporation located in Southbridge, MA. It operates and maintains Harrington Memorial Hospital, a hospital with campuses in Southbridge, MA and Webster, MA. It uses the UMass Memorial Website to communicate with healthcare consumers.

16.     In this complaint, Plaintiff refers collectively to the defendants described in this section as "Defendants."

## JURISDICTION

17.     The exercise of personal jurisdiction over the Defendants is proper according to M.G.L. c. 223 § 3 because, among other things, Defendants are located in Massachusetts, and Plaintiff's claim arises out of Defendants' transacting business in the Commonwealth of Massachusetts.

## FACTUAL ALLEGATIONS

### The UMass Memorial Facilities and Their Website

18.     Defendants operate hospitals and other healthcare facilities in Worcester and surrounding communities (the "UMass Health Facilities"). The UMass Health Facilities offer inpatient and outpatient care to residents near Worcester and surrounding communities in central Massachusetts. The facilities provide healthcare across various specialties, including heart and vascular care, orthopedics, cancer, diabetes, surgery, pregnancy and newborn care, children's services, women's services, and trauma care.

19.     Defendants maintain a common website for their hospitals and other healthcare facilities, found at https://www.ummhealth.org/ (the "UMass Memorial Website"). Through that website, healthcare consumers can obtain information about the services UMass Memorial provides, including information about doctors, services and treatments provided by Defendants, and particular medical conditions.

20.     The UMass Memorial Website is designed for communications with healthcare consumers. The website includes the following functions:

(a)     The website provides general information about the UMass Memorial Facilities.

(b)     The website provides information about healthcare services provided at the UMass Memorial Facilities, communicated through service-specific pages for a range of services such as "Birthing/Maternity Center," "Pediatrics," "Cancer Care," and "Women's Health," among others.

(c)     The website provides substantive information about specific health conditions through the website's "Health Library," including numerous interactive "Risk Assessments" individuals can take to determine whether they need healthcare services for a range of conditions, including highly personal conditions such as drug addiction, alcohol abuse, and sexually transmitted diseases.

(d)     The website permits healthcare consumers to use a "Find a Doctor" function to search for doctors by specialty, gender, language, and location.

(e)     The website permits healthcare consumers to book an appointment online through the website.

(f)     The website permits healthcare consumers to access and pay bills online.

(g)     The website lets healthcare consumers access their private medical information online through the MyCharts portal. MyCharts is a third-party provider of online access to healthcare records.

21.     Because the UMass Memorial Website provides an interactive experience through which a healthcare consumer can obtain information about particular conditions, doctors, specialties, and, indeed, the individual's own healthcare records, a website user's interaction with the website reveals private health information about the individual.

## Reasonable Expectations of Users of the UMass Memorial Website

22.     Healthcare consumers in Massachusetts have a valid interest in preserving the confidentiality of communications with healthcare providers. Among the ways healthcare consumers communicate with healthcare providers is through those providers' websites, such as the UMass Memorial Website.

23.     Users of healthcare-related websites such as the UMass Memorial Website have a legitimate expectation and understanding that their communications with the website will be private. They also have a legitimate expectation that healthcare providers such as Defendants will not share their private health information—including their communications with the website— with third parties, without their consent.

24.     The expectations and understandings of website users are supported by the Health Insurance Portability and Accountability Act ("HIPAA"), which prohibits healthcare providers such as Defendants from using or disclosing individuals' protected health information without valid authorization from the individual. *See* 45 C.F.R. §  164.508(a)(1), (3). No exception allows healthcare providers to share protected information with social media and other technology companies for marketing purposes.

25.     Healthcare consumers would **not** anticipate or expect that their communications with healthcare providers, which reveal information about that individual's personal health conditions, will be intercepted and secretly shared contemporaneously with third parties such as Google and Facebook for marketing purposes.

26.     The expectations and understanding of the UMass Memorial Website users are informed by what Defendants tell them about how Defendants handle their personal information.

27.     The UMass Memorial Website terms of service state:

> UMass Memorial Health Care is committed to protecting your privacy. We have designed our website to allow you to visit most areas without identifying yourself or providing personal information. For those UMass Memorial areas where you elect to provide identifiable information, we assure you that we will make every effort to protect your privacy.

This is false. As explained more fully below, the website tracks the user's IP address and connects its IP address to the user's browsing activity. More troublingly, those communications and associated IP addresses are contemporaneously shared with third parties such as Google and Facebook, which then can use that information to connect the user's activity on the website with the individual's Google and Facebook profiles. The tracking technologies reveal private health information about particular individuals to Google and Facebook. Google and Facebook can then use to serve personalized advertising to those individuals.

28.     The UMass Memorial Website terms of service also tell users: "UMass Memorial does not disclose your information to third parties except as described below, when we believe in good faith that the law requires disclosure, or to protect the property rights of UMass Memorial." The terms "below," however, do not disclose that Defendants share the internet communications with Facebook, Google, and other companies between the users and Defendants. Accordingly, the terms are utterly false and foster an incorrect understanding among healthcare consumers that Defendants do not share personal information about their them when they do.

29.     The UMass Memorial Website's terms of service also tell users: "UMass Memorial may on occasion send you information concerning the health, development and well-being of children and families, and on other topics that might be of interest. Only UMass Memorial (or those working on the behalf of UMass Memorial) will send you this information." Again, this is utterly false. By sharing healthcare consumers' communications with Google and Facebook, Defendants enable Google and Facebook to send directly to specific users advertising based on their communications with the website.

8

30.     The UMass Memorial Website terms of service also describe to healthcare consumers the website's use of "cookies" in a deceptive manner. The terms state:

> A cookie is a piece of data stored on your hard drive that contains information about you. Use of a cookie is in no way linked to any personally identifiable information while on the UMass Memorial site. UMass Memorial only uses cookies to identify you while you are logged into the UMass Memorial site. Upon exiting the site, the cookie terminates with no retained record of your use of the site.

As explained below, the technologies Defendants use to transmit healthcare consumers' communications contemporaneously to Google, Facebook, and other companies are not limited to "cookies." But, in any event, the above passage and the other passages quoted above foster a strong impression that a user's activities on the website will not be linked to personally identifiable information. This is false. As described below, Defendants use Google, Facebook, and other tracking technologies specifically designed to associate the users' activities on the website with their profiles with Google, Facebook, and elsewhere.

31.     Moreover, it is utterly false to state that "[u]pon exiting the site, the cookie terminates with no retained record of your use of the site." On the contrary, Facebook, Google, and other third parties retain precise records of website users' activities on the UMass Memorial Website.

32.     In short, reasonable healthcare consumers expect that the personal health information reflected in their communications with healthcare-related websites will not be shared with third parties without their consent—an understanding reinforced strongly by Defendants' false statements on their website. The interceptions of website users' communications with Defendants were, therefore, truly secret and made without any consent from the website users.

**Third-Parties Offering Tracking Technologies**

33.     Plaintiff describes in this complaint various tracking technologies implemented on the UMass Memorial Website that cause the secret interception, recording, and retransmission of

the contents of Class Members' internet communications with Defendants. The technological aspects of those technologies are described in the next section. This section provides a brief overview of the third parties that intercept and record the contents of Class Members' internet communications with Defendants and the purposes for which interceptions are made.

34.     Meta Platforms, Inc., referred to in this complaint by its former and more familiar name, "Facebook,"[1] is a multinational technology conglomerate based in Menlo Park, California. It owns and operates social media platforms, including Facebook and Instagram, as well as various other software and technology products and services.

35.     Facebook maintains detailed profiles on individuals that include the users' real names, locations, email addresses, friends, and communications that Facebook associates with personal identifiers, including IP addresses and device identifiers.

36.     Facebook derives most of its revenues from selling targeted advertising to users of its platforms, including Facebook and Instagram. Facebook tailors advertising toward particular individuals by building extensive behavioral profiles about each individual. These profiles are based not only on those individuals' use of Facebook products, such as Facebook and Instagram, but also on the activities of those individuals on other websites that Facebook does not own.

37.     Among the ways Facebook tracks users on websites not owned by Facebook in order to create detailed individual profiles is by offering websites with the tracking technology known as Meta Pixel, formerly known as Facebook Pixel. Facebook incentivizes websites to use Meta Pixel by advertising that it allows website owners to track users across their website and to optimize Facebook advertising based on how they use the websites.

---

[1] Facebook rebranded its parent company as "Meta" in October 2021.

38.     Facebook explains on its own website: "The Meta Pixel is a snipper of JavaSript code that allows [companies] to track visitor activity on your website."

39.     Facebook explains further: "Once you've set up the Meta Pixel, the Pixel will log when someone takes an action on your website…. The Meta Pixel receives these actions, or events, which you can view on your Meta Pixel page in Events Manager."

40.     Therefore, the Meta "pixel allows Facebook to be a **silent third-party watching whatever you're doing**."

41.     Google LLC is a multinational technology conglomerate, a wholly owned subsidiary of Alphabet Inc. Google LLC is referred to in this complaint as simply "Google." Google owns and operates various software services, including the popular Gmail email service, Google's search platform, and numerous other internet software services. It also manufactures technology products, including cell phones, smart home devices, and computers.

42.     Google maintains detailed profiles on individuals that include information such as their real names, dates of birth, email addresses, phone numbers, and details on interactions such individuals have with Google's services, such as Gmail. Google maintains detailed profiles on individuals whether or not they have a Google account.

43.     Google derives a substantial portion of its revenues through individually targeted advertising. Specifically, Google uses the information it collects on individuals to tailor advertising specifically to the individual, making Google's advertising more valuable than other forms of advertising that are not customized to the individual.

44.     One way Google collects information to build its detailed profiles on individuals is through the tracking technology known as Google Analytics. Google incentivizes websites to use Google Analytics by offering it as a free tool for websites to track the behavior of users on its

website. The tracking information recorded through Google Analytics and accessible by the website owner provides the website owner with insights about how users use the website, which the owner can use to improve the website. Notwithstanding its availability as a free service to website owners, Google can profit from Google Analytics by using the data obtained about individual users to build such individuals' profiles further. This information can then be used to serve upon such individuals better-targeted individualized advertisements.

### **Website Tracking Technologies on the UMass Memorial Website**

45.     Defendants have injected hidden code into the UMass Memorial Website that tracks healthcare consumers' communications with the website. The tracking technologies permit third parties such as Google and Facebook to associate a website user's browsing activity with particular individuals known to Google and Facebook. This includes, for example, associating the content of the user's communications with the UMass Memorial Website with the website user's Facebook profile.

46.     These tracking technologies transmit to Google, Facebook, and other companies, contemporaneously with the website communications between Class Members and Defendants, the contents of communications between Class Members and Defendants and identifying information about the Class Members. The contents intercepted include private health information, including the individual's medical conditions, doctors they may be seeing, medical searches the individual performs on the website, and personal medical information the user enters into forms on the website. This information reflects individuals' personal health information as defined by the Health Information Portability and Accountability Act ("HIPAA").

47.     Defendants use several tracking technologies on their website, including Google Analytics and Meta Pixel. The tracking technologies are implemented through similar means.

48.     Before describing the techniques such technologies use, it is important to define some basic technological terms.

49.     A **"browser"** or **"web browser"** is software on a computer or other device (such as a tablet or cell phone) that permits a website user to view a webpage. Examples include Google Chrome, Safari, and Firefox.

50.     An **"IP address"** is a unique combination of four numbers, each between 0 and 255, that serves as a particular device's address on the internet. Both websites and website users have IP addresses. For example, the IP address for the UMass Memorial Website, as of the time of this complaint, is 162.249.110.234. When they connect to the internet, particular individuals also have their own unique IP addresses. Companies such as Google and Facebook associate particular individuals with IP addresses to help track them across the internet for commercial purposes.

51.     A **"URL"** is another form of an address specifically for websites (or a webpage on a website) that a web browser can translate into an IP address to load the website. A URL is the familiar address often preceded by "http://." For example, the URL for the main landing page for the UMass Memorial Website is http://www.ummhealth.org. Numerous URLs also point to specific pages on that website; often, a URL will contain information about the particular webpage itself. For example, the UMass Memorial Website has a page specifically about the UMass Memorial Health Cancer Center; that page's URL is https://www.ummhealth.org/umass-memorial-health-cancer-center.

52.     A **"cookie"** is a file saved on a website user's device that helps track the user across different web pages or websites. Cookies can, for example, confirm to Google and Facebook that

a particular individual accessing the UMass Memorial Website is the same individual who also accesses a particular Google or Facebook account from the same device.

53.     **"Javascript"** is a type of computer code that can be included on a website. A website user's browser downloads and "runs" the code within the browser. The Javascript code can perform various functions, including causing the browser to load components of the website, providing interactive functionality in the website, transmitting information from the browser to servers on the internet, or performing other functions in the background. Unlike many other components of a website, such as text and images, which are visible to the website user, the Javascript code itself is not visible. The execution of Javascript code may or may not result in the presentation of visible components of the website.

54.     With those basic terms in mind, the tracking technologies described in this complaint—in particular, Google Analytics and Meta Pixel—work as follows. In general terms, a website owner (here, Defendants) inserts into its website code that causes an individual's web browser, when loading the website, to also load a Javascript file from a third-party server (such as Google or Facebook). That Javascript code is executed automatically within the individual's web browser.

55.     The execution of the Javascript code causes the individual's web browser to retrieve a very small file from the third-party's website, such as a single-pixel image from Facebook's server (hence the origin of the phrase "Meta Pixel" or "Facebook Pixel" to describe the tracking technology). That image or other small file is not displayed or visible to the website user; the loading and execution of the Javascript code and the subsequent loading of an image or another small file occurs entirely in the background, invisible to the website user.

56.     Critically, when the Javascript code causes the user's web browser to retrieve a file from the third-party's website, the Javascript code also causes the browser to communicate certain information to the third-party website. That information can include: (i) the URL of the website user is visiting (that is, the website address, such as http://www.ummhealth.org); (ii) the title of the particular webpage being visited; (iii) metadata from the website, including information describing the content of the website; (iv) information the user has submitted to the website, such as search terms or any other information inputted out into a form (even if the user has not yet "submitted" the form); (v) whether and to what degree the user has scrolled through the website; (vi) if a user has made a selection on any drop-down menu on the website, the content of that selection; and (vii) prior pages the website user has visited before viewing the current page.

57.     When the Javascript code causes the browser to communicate the information described in the paragraph above to third-party servers such as Google or Facebook, the code also causes the browser to reveal the website user's IP address to the third-party website. This disclosure permits the third party, such as Google or Facebook, to associate the information it has received about the individual's communications with the website to the identity of a particular individual known to Google and Facebook. A third-party such as Google and Facebook can then add the content of the user's communications with the UMass Memorial Website to its collection of information it has about the individual, which it can then use for advertising purposes. For example, when Meta Pixel's Javascript code causes a "pixel" to be loaded from Facebook's servers, Facebook can record and associate the content of the communications it has intercepted with an individual's Facebook profile, which includes the individual's real name and other information about them.

58.    The code for tracking technologies is invisible to a website user. By design, the tracking technologies work so that no visible evidence of the technology is shown to the user. For example, even though some technologies may load a small single-pixel image or another file, that image is not actually displayed as part of the website; instead, it is loaded in the background solely for the purpose of transmitting the content of the user's communications and the user's identity the third party such as Google or Facebook.

59.    The tracking technologies described in this complaint intercept and retransmit to third parties the contents of communications between healthcare consumers and the UMass Memorial Website contemporaneously with those communications. The tracking technologies intercept and retransmit the contents of those communications to third parties before the webpage has even completed loading.

**Defendants' Use of Tracking Technologies on the UMass Memorial Website**

60.    Defendants use various tracking technologies across the numerous web pages on the UMass Memorial Website. Many of those tracking technologies are embedded in the code of all or almost all of the pages within the Umass Memorial Website. For example, on the main landing page of the UMass Memorial Website, Defendants have injected secret code that loads Google Analytics, Meta Pixel, and various other tracking technologies.

61.    The code is invisible to website users but becomes visible only when using special "developer" software such as Google's "Developer Mode." Google's Developer Mode displays hidden components of websites and records the network activity generated by website components (including the loading and execution of Javascript code and the text that the Javascript code causes to be transmitted to third-party web servers when it loads a small file or image).

62.    Below is an image of the main landing page for the UMass Memorial Website:



63.     When a user loads the main landing page for the UMass Memorial Website, the webpage causes the user's web browser to download from Google's servers a file called "analytics.js," which contains the Javascript code for Google Analytics. The website then causes the user's web browser to execute the Javascript code contained in the "analytics.js" file. That code, in turn, causes the user's web browser to connect to Google's servers again to load a small file. When the user's web browser loads this small file, the Google Analytics Javascript code causes the user's web browser to intercept and transmit certain information to Google.

64.     The image below depicts the landing page for the UMass Memorial Website on the left-hand-side, and to the right of it, Google Developer Mode, which inspects the components of the website and the network traffic those components generate:



65.     A closer view of Google Developer Mode, focusing specifically on the contents of the communication intercepted and retransmitted to Google, is presented below (with highlighting added). The "Payload" refers to information transmitted to a web server when a file is retrieved from that server. In this case, the "Payload" reflects the information that Google Analytics causes the user's web browser to intercept and transmit to Google when a small file is loaded from Google's servers:



66.     Among the information transmitted to Google's servers contemporaneously with

the communications between the website user and the UMass Memorial Website are:

(a)     The URL of the webpage visited (the text after the letters "dl," which includes the
        text "www.umasshealth.org"[2]);

(b)     The URL of the prior webpage the user had visited before arriving at the UMass
        Memorial Website landing page (www.google.com); and

---

[2] The characters "%3A" and "%2F" are comptuer codes that replace the ":" and "/" characters.

(c)     The title of the webpage (after the letters "dt," which includes "UMass Memorial Health").[3]

67.     The other information Google intercepts includes data about the user's web browser configuration (including screen resolution, viewport resolution, and other browser settings), identification codes used to connect the browsing activity with a Google Analytics account held by the website (here, UMass Health) and the website's account with Google AdSense, a website monetization program offered by Google. The information transmitted also contains a unique identifier for the particular user visiting the website, enabling Google to track that individual across the website.

68.     Notably, when the website user's web browser intercepts the contents of communications between the website user and the Defendants' website and retransmits those contents to Google, the Javascript code also causes the user's web browser to reveal the user's IP address to Google. This permits Google to associate the content of the user's communications with the website with any other information Google has on the individual, including the individual's real identity. Google can then use the contents of communications that it has secretly intercepted for commercial purposes, including serving personalized advertisements in the future to the particular website user browsing the UMass Memorial Website.

69.     Moreover, by communicating information about the website user's browser configuration (such as screen and portal resolution and other browser configuration settings), Google can further confirm the user's identity through a technique known as "browser fingerprinting." In short, browser fingerprinting associates particular individuals with unique combinations of web browser settings. This allows Google to confirm further that a particular individual using Google's services (for example, a Gmail account) and an individual visiting the

---

[3] The characters "%20" are comuter code that reflect a space.

UMass Memorial Website is the same individual, particularly when combined with the user's IP address, which is also a unique identifier.

70.     The same landing page on the UMass Memorial Website also loads Javascript code for Meta Pixel, called "fbevents.js." That javascript code, in turn, causes the website user's browser to secretly and contemporaneously intercept and transmit to Facebook the website user's communications with the UMass Memorial Website. The network activity intercepted and retransmitted to Facebook when loading the UMass Memorial Website's landing page is below:



71.     Similar to Google Analytics, Meta Pixel causes the user's web browser to intercept and transmit to Facebook the contents of the communications between the website user and the Defendants' website, including the URL of the webpage visited. The transmission to Facebook

also includes information about the user's browser configuration and various codes to associate the communications with Defendants' advertising account with Facebook.

72.     Also, similar to Google Analytics, the Javascript code for Meta Pixel causes the user's web browser to reveal the user's IP address to Facebook. This permits Facebook to associate the content of the website user's communications with the website to the user's Facebook profile (or the profile of other websites owned by Facebook, such as Instagram). With that information, Facebook can serve personalized advertising to the website user in the future.

73.     Moreover, similar to Google Analytics, the transmission to Facebook of the user's browser configuration permits Facebook to confirm the user's identity through browser fingerprinting (that is, comparing the unique combination of browser settings revealed to Facebook via the Meta Pixel Code to Facebook's own records of the same browser configuration when the same individual visits Facebook, Instagram, and other Facebook-owned websites).

74.     The text fields communicated to Facebook by the Meta Pixel code include a persistent identifier for each particular user, which permits Facebook to track that individual across the UMass Health Website and further confirm that individual's real-world identity.

75.     Defendants have configured the UMass Memorial Website to intercept and retransmit to Google, Facebook, and other third parties specific information about the webpages a healthcare consumer visits within the UMass Memorial Website, which in turn may reveal private health information about the healthcare consumer.

76.     The further examples presented below do not necessarily reflect webpages Plaintiff personally visited but are presented for illustrative purposes.

77.     The UMass Memorial Website contains a page entitled "Women's Health: Maternity Center," designed to provide information to the website user about pregnancy and the

services Defendants offer in connection with pregnancy. A user, by visiting this web page, necessarily reveals to Defendants that the user has some interest in maternity services (for example, the user might be pregnant or know someone who is). When the user communicates with Defendants by visiting this particular webpage, Defendants cause the secret interception and transmission of that communication to Google, Facebook, and other third parties. Below is a screenshot of the Maternity Center webpage:



78.    The graphic below presents the contents of the communication between the website user and Defendants that are secretly intercepted and transmitted to Google when the above page loads as a result of the Google Analytics javascript code that Defendants secretly inject into the website (the blue highlighting is added):



79.     As reflected in the above screenshot, Defendants contemporaneously intercept and retransmit to Google the fact that the website user is visiting a "maternity-center" webpage—information that Google then stores and can use for its own commercial purposes (and which could be accessible via subpoena by third parties, such as states who may be interested in such information for political or legal reasons).[4]

80.     The same webpage also contains hidden code that intercepts the user's communication with the website and retransmits that same information to Facebook. The data transmitted to Facebook is depicted below:

_____

[4] *See, e.g.,* NRP, "Privacy advocates fear Google will be used to prosecute abortion seekers," https://www.npr.org/2022/07/11/1110391316/google-data-abortion-prosecutions.



81.     Similar to Google Analytics, Defendants cause the secret interception and transmission to Facebook of the contents of the communication between the website user and Defendants, including that the user is visiting a "maternity-center" webpage, which Facebook can then use for commercial purposes (and which data it retains, and can then be accessed by third parties, such as by way of subpoena).

82.     The UMass Memorial Website contains dozens of similar pages on particular medical specialties and practices that the Defendants' healthcare facilities offer. The UMass Memorial Website, for each of such page, aids in Google and Facebook's secret interception of the contents of communications with the webpages, similar to the above Maternity Center example.

83.     The UMass Memorial Website also includes a search function that permits an individual to search for medical or other information relevant to them. Healthcare consumers often enter search terms that reveal private health information about them, for example, when an individual uses the search function for particular symptoms, conditions, or medical specialties offered by Defendants. When an individual uses the search function, Defendants aid in the secret interception of the contents of that search and retransmission of those contents to Google, Facebook, and other third parties.

84.     For example, the screenshot below depicts the search results page when a user enters the phrase "I'm pregnant"[5] into the search bar on the UMass Memorial Website:



_____

[5] This is an example and does not reflect Plaintiff's personal activity on the website.

85.     Depicted below are the contents of the communication that are intercepted and retransmitted to Google via hidden Google Analytics Code (with highlighting added):



86.     The above screenshot reflects that when an individual enters a search on the website, Google intercepts the contents of the search. Google then associates those search terms with the individual's real-world identity and then uses that information for commercial purposes (and retains them for potential use by other parties in the future).

87.    Defendants also aid in Facebook's secret interception of the same sensitive communication. Below is a screenshot of the information intercepted and transmitted to Facebook:



88.    The UMass Memorial Website also includes a "Find a Doctor" function that allows healthcare consumers to find a doctor based on search criteria provided by the individual. That webpage permits individuals to search by hospital affiliation, zip code, specialties, gender, and languages. When an individual uses the drop-down menus and forms to indicate the individual's preferences for doctors, this causes the page to reload. The results page lists doctors that match the

criteria specified by the user. The page below depicts part of the results for a search for a female

doctor in Obstetrics & Gynecology within five miles of Worcester[6]:



89.     Hidden Google Analytics code in this results page causes the secret interception of

the facts that the individual is using the find-a-doctor function and the specific criteria the

individual has inputted. The contents of the communication that are secretly intercepted and

transmitted to Google are captured below:

---

[6] Again, this is not a search Plaintiff performed but is instead presented to illustrate the types of
communications that tracking technologies intercept and retrainsmit to third parties.

× Headers  Payload  Preview  Response  Initiator  Timing

▼ Query String Parameters      view source      view URL-encoded

v: 2

tid: G-HDYC9M7247

gtm: 2oeb90

_p: 1829352063

cid: 1880997322.1664411875

ul: en-us

sr: 1920x1080

uaa: x86

uab: 64

uafvl: Google%20Chrome;107.0.5304.107|Chromium;107.0.5304.107|Not%3D
A%3FBrand;24.0.0.0

uamb: 0

uam:

uap: Windows

uapv: 10.0.0

uaw: 0

_s: 1

sid: 1668449031

sct: 4

seg: 1

dl: https://physicians.umassmemorial.org/results?Affiliations=60&Sub
Specialties=1636%2c1635&address=Worcester%2c+MA+01601%2c+USA&dis
tance=5&latlng=42.26%2c-71.8&sortDirection=asc&sortby=distance&G
ender=Female

dr: https://physicians.umassmemorial.org/results?Affiliations=60&Gen
der=Male%2CFemale&SubSpecialties=1636%2C1635&sortby=distance&sor
tDirection=asc&address=Worcester%2C+MA+01601%2C+USA&distance=5&l
atlng=42.26%2c-71.8

dt: Search Results - UMass Memorial Health

en: page_view

90.    The highlighted portion above uses numeric codes for the affiliations and specialties criterion ("Affiliations=6" references UMass Memorial Medical Center, and "SubSpecialties=163" references Obstetrics & Gynecology), and the preferred geographic location ("Worcester") and doctor gender ("Female"), plus the permissible distance from Worcester ("5"

miles). Each of these inputs are intercepted by Google. Although a couple of fields use numeric codes, the meaning of those codes can easily be discerned by loading the full URL, including the parameters highlighted in blue above, to reveal the substance of the individual's search.

91.     The UMass Memorial Website also features numerous "Risk Assessments," through which individuals can relate information about themselves to receive an instant assessment. Those assessments include, among others, an Alcohol Use Assessment, a Breast Cancer Risk Assessment, a Depression Risk Assessment, and a Substance Abuse Assessment. The screen capture below, for example, depicts the Substance Abuse Assessment (the selected answers do not reflect any particular individual's responses but are provided by way of example):



92.    When a website user first loads a risk assessment, that communication is intercepted via Google Analytics code, and communication contents are transmitted to Google. The graphic below depicts the information intercepted and transmitted to Google upload loading of the Substance Abuse Assessment:



93.    As highlighted above, the fact that a user is taking a Substance Abuse Assessment is communicated to Google via Google Analytics.

94.     When a user completes and submits the assessment form, a new webpage is loaded

with the user's results. That page is depicted below:



95.     When the results page loads for the risk assessment, that communication is secretly

intercepted via the Google Analytics code, and parts of the communication are sent to Google. The

information sent to Google is depicted below:



96.     The user's responses to each question in the risk assessment are highlighted in the

screen capture above. Those responses are intercepted and transmitted to Google. Although the

parameters are communicated in code (after the word "Parameters"), that code can easily be used

to identify the user's response to each question by loading the full highlighted URL.

97.     The above examples are just that—examples. Defendants use similar Google Analytics and Meta Pixel code throughout nearly all parts of the UMass Memorial Website, closely tracking individuals' communications with the UMass Memorial Website.

98.     In addition to Google and Facebook, the communications between healthcare consumers and UMass Health are intercepted and retransmitted to various companies without the individual's consent. These additional third parties include:

(d)     **Bing Ads.** Bing Ads is an internet advertising platform owned by Microsoft. Similar to Google Analytics and Meta Pixel, Defendants insert code into their website that causes communications between the user and the website to be intercepted by and transmitted to Microsoft's Bing Ads servers. The contents intercepted include the URL and title of each website visited and the user's IP address. Microsoft can then monetize that information through advertisements.

(e)     **Doubleclick.** Google Doubleclick is an internet advertising platform. Similar to Google Analytics and Meta Pixel, Defendants insert code into their website that causes communications between the user and the website to be intercepted by and transmitted to Google. The contents intercepted include the URL and title of each website visited and the user's IP address. Google can then monetize that information through advertisements.

(f)     **S**harethis. Sharethis is a company that tracks the behavior of users of websites. Similar to Google Analytics and Meta Pixel, Defendants insert code on their website that causes the contents of the user's communications with the website, including pages viewed, the contents of searches, and other information, to be sent to the sharethis.com server. The code also causes the user's IP address to be revealed to Sharethis.

**The Secret Use of Website Tracking Technologies Such as Meta Pixel and Google Analytics Is Not Necessary**

99.     The secret use of tracking technologies such as Meta Pixel and Google Analytics is not necessary for the UMass Health Website's operation. The UMass Health Website can and would operate just the same from the perspective of healthcare consumers without the tracking technologies described in this complaint.

100.     Tracking technologies such as Google Analytics and Meta Pixel are distinct from and are not necessary to feature Google or Facebook-associated functionality on the website. For

example, a website can contain links to its Facebook profile or invite website users to interact with Defendants via Facebook without using Meta Pixel. Meta Pixel is an entirely distinct feature from a simple link to a Facebook profile; any website can have one without the other.

101.    Moreover, even if a company wishes to use tracking technologies to optimize its website or its marketing or advertising for a website, there is no legitimate business reason for any company to keep secret from website users the use of these tracking technologies. Indeed, disclosure of such tracking technologies is possible and, if implemented properly, would avoid the secret interception of internet communications. Some websites, for example, disclose tracking technologies through a pop-up displayed to the user when the user first accesses the website. The quality and legal validity of these kinds of disclosures vary depending on how they are presented and their substance, but a disclosure could, in principle, disclose the use of tracking technologies and their impact on confidentiality.

102.    A healthcare consumer visiting the UMass Memorial Website is presented with no pop-up disclosure informing them that their communications with the website are intercepted or tracked. Even if the UMass Memorial Website were to feature such a pop-up that links to the UMass Memorial Website terms of service or privacy policy, those policies do **not**, as described above in paragraphs 26 to 31, disclose the tracking technologies described in this complaint. To the contrary, those terms of service mislead website users by telling them that such sharing of communications between Class Members and Defendants is **not** taking place.

### Class Action Allegations

103.    Plaintiff brings this action under Mass. R. Civ. Proc. 23 on behalf of herself and the Class, which includes:

> All Massachusetts residents who, while in the Commonwealth of Massachusetts, accessed any portion of the website at www.ummhealth.org within three years prior to the date of the original complaint in this action.

104.   This action is properly maintainable as a class action.

105.   The Class Members are so numerous that joinder of all members in a single lawsuit is impractical.

106.   Common questions of law and fact exist for all Class Members, and those questions predominate over any questions solely affecting individual members of the Class. Among the predominant questions of law and fact common to the Class are:

(a)   Whether communications between Class Members and Defendants, through the UMass Memorial Website, were wire communications under the Massachusetts Wiretap Act.

(b)   Whether Defendants inserted tracking technologies into the hidden code of the UMass Memorial Website, including Google Analytics and Meta Pixel;

(c)   Whether the tracking technologies inserted into the hidden code of the UMass Memorial Website  are "intercepting devices" as defined in the Massachusetts Wiretap Act, M.G.L. c. 272 § 99(B)(3);

(d)   Whether the computer code for tracking technologies such as Google Analytics, Meta Pixel, and others, enabled Google, Facebook, and other third parties to record and disclose to Google, Facebook, and other third parties the contents of communications between Defendants and users of the UMass Memorial Website;

(e)   Whether the computer code for tracking technologies such as Google Analytics, Meta Pixel, and others disclosed to third parties such as Google, Facebook, and others the identity of the parties to the communication, the existence of the communication, and the communications' content, substance, purport, and meaning;

(f)   Whether, by inserting the computer code for Google Analytics, Meta Pixel, and other tracking technologies, Defendants installed an intercepting device on their website with the intent to aid Google, Facebook, and other companies to hear and record communications between the Class Members and Defendants;

(g)   Whether Class Members' communications with Defendants were intercepted, disclosed to Google, Facebook, and other third parties, and used without their knowledge or consent;

(h)   Whether Class Members' privacy interests were violated by the interceptions of their communications with Defendants' website;

(i)     If Plaintiff prevails on the merits of her Massachusetts Wiretap Act claim, the remedies afforded under the Massachusetts Wiretap Act to Class Members, including statutory remedies, attorneys' fees, and litigation disbursements.

107.     Plaintiff's claims are typical of Class Members' claims because, like Plaintiff, each Class Member accessed the UMass Memorial Website and had their communications with that website secretly intercepted and transmitted to third parties without their knowledge or consent.

108.     Plaintiff will fairly and adequately protect the interests of the Class Members and has retained counsel who have extensive experience prosecuting consumer class actions and who, with Plaintiff, are fully capable of, and intent upon, vigorously pursuing this action. Plaintiff has no interest adverse to the Class.

109.     A class action is superior to all other available methods for this controversy's fair and efficient adjudication. Furthermore, the damage that any individual Class member has suffered is not likely substantial enough to justify the expense and burden of individual litigation. Hence, it would be impracticable for all Class Members to redress the wrongs done to them individually. There will be no difficulty in managing this action as a class action.

110.     Defendants have acted on grounds generally applicable to the Class, making appropriate the relief Plaintiff seek for the Class as a whole.

## COUNT I

**(Violation of the Massachusetts Wiretap Act, M.G.L. c. 272 § 99, on behalf of the Class)**

111.     Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

112.     The Massachusetts Wiretap Act, M.G.L. c. 272 § 99, makes it an unlawful act to "secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire or oral communication through the use of any intercepting device by any person other than a person given prior authority by all parties to such communication." *Id.* ¶ (B)(4), (C). The Act

provides a private remedy to any "person whose oral or wire communications were intercepted." *Id* ¶ (C).

113.    An individual's communications with a website constitute "wire communications" as defined in the Massachusetts Wiretap Act, M.G.L. c. 272 § 99(B)(1). The communications between Plaintiff and other Class Members and Defendants, through the UMass Memorial Website, were therefore wire communications under the Massachusetts Wiretap Act.

114.    The tracking technologies inserted into the hidden code of the UMass Memorial Website, including Google Analytics and Meta Pixel, are "intercepting devices" as defined in the Massachusetts Wiretap Act, M.G.L. c. 272 § 99(B)(3). "Intercepting devices" also include (i) any devices Class Members used to access the UMass Memorial Website; (ii) Class Members' web browsers used to access the UMass Memorial Website; (iii) Defendants' own computer servers; and (iv) the computer servers of third-parties such as Google and Facebook which intercepted Class Members' communications with the UMass Memorial Website.

115.    The computer code for tracking technologies such as Google Analytics, Meta Pixel, and others, enabled Google, Facebook, and other third parties to record and disclose to Google, Facebook, and other third parties the contents of communications between Defendants and users of the UMass Memorial Website, including, but not limited to, the identity of the parties to the communication, the existence of the communication, and the communication's content, substance, purport, and meaning, including but not limited to (i) the identity of webpages the user visited; (ii) the precise text of search queries; (iii) the search criteria individuals used to find doctors; and (iv) the precise contents of information the individuals inputted onto forms on the website.

116.    By inserting the computer code for Google Analytics, Meta Pixel, and other tracking technologies, Defendants installed an intercepting device on their website with the intent

39

to aid Google, Facebook, and other companies to secretly hear and record communications between the Class Members and Defendants.

117.    Class Members' communications between the Class Members and Defendants were intercepted, disclosed to Google, Facebook, and other third parties, and used without their knowledge or consent. Moreover, their privacy interests were violated by the interception.

118.    Pursuant to the Massachusetts Wiretap Act, Plaintiff seeks for herself and each Class Member statutory damages of $100 for each day of violation or $1,000, whichever is higher, plus reasonable attorneys' fees and other litigation disbursements that her counsel has incurred and will reasonably incur in prosecuting this action.

## **Prayers for Relief**

WHEREFORE, Plaintiff prays for relief in the form of an order as follows:

a.    Certifying this action as a class action under Massachusetts Rule of Civil Procedure 23, and appointing Plaintiff as class representative and her attorneys as class counsel;

b.    Awarding damages to Plaintiff and Class Members;

c.    Awarding attorneys' fees, expenses, and the costs of this suit, together with prejudgment and post-judgment interest at the maximum rate allowed by law; and

d.    Awarding such other and further relief which the Court finds just and proper.

## Jury Demand

Plaintiff demands a trial by jury on all claims so triable.

Dated: December 20, 2022                    Respectfully submitted,


                                            */s/ Michelle H. Blauner*
                                            SHAPIRO HABER & URMY LLP
                                            Edward F. Haber (BBO #215620)
                                            Michelle H. Blauner (BBO #549049)
                                            Patrick J. Vallely (BBO #663866)
                                            One Boston Place
                                            Suite 2600
                                            Boston, MA 02108
                                            (617) 439-3939 – Telephone
                                            (617) 439-0134 – Facsimile
                                            ehaber@shulaw.com
                                            mblauner@shulaw.com
                                            pvallely@shulaw.com